UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
LEE A. PICKHOVER,                                   )
                                                    )
            Plaintiff,                              )
                                                    )          Civil Action No.
      v.                                            )          20-11967-FDS
                                                    )
KILOLO KIJAKAZI,                                    )
Acting Commissioner of Social Security,             )
                                                    )
            Defendant.                              )
_____)

MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION
FOR ORDER REVERSING THE COMMISSIONER'S DECISION

SAYLOR, C.J.

        This is an appeal from the final decision of the Acting Commissioner of the Social

Security Administration denying an application for disability benefits and supplemental security

income ("SSI").[1]  Plaintiff Lee A. Pickhover contends that she became disabled on March 19,

2016, due to musculoskeletal, mental health, and gastrointestinal issues.  She disputes the

Commissioner's decision that she is not "disabled" within the meaning of the Social Security

Act.

        Pickhover has moved for an order reversing that decision, and the Commissioner has

cross-moved for an order affirming it.  For the reasons stated below, the Court will grant

plaintiff's motion to reverse the Commissioner's decision and remand for further proceedings,

and the motion to affirm will be denied.

_____

        [1] The Acting Commissioner of the Social Security Administration, Kilolo Kijakazi, has been substituted as
the named defendant pursuant to Fed. R. Civ. P. 25(d).

I.      **Background**

The following is a summary of the relevant evidence in the administrative record

("A.R.").

A.      **Education and Occupational History**

Lee A. Pickhover was born on May 31, 1975, and is currently 46 years old.  (A.R. at

354).  She was 40 years old at the alleged onset of her disability on March 19, 2016.  (*Id.* at 506).

She has a high-school education and completed some college and paralegal training.  (*Id.* at

1117).  As of January 1, 2016, she resided in Attleboro, Massachusetts.  (*Id.* at 355).

Pickhover worked from 2000 to 2005 as an account manager; for two months in 2008 as

a store laborer; for less than a year in 2013 as a fast-food services assistant manager; from 2013

to 2014 as a store manager; and from 2014 to 2016 as a general store clerk.  (*Id.* at 377).  She last

reported earnings in 2016.  (*Id.* at 367).  Her work history has not changed since her initial

hearing on August 29, 2018.  (*Id.* at 506).

B.      **Medical History**

Pickhover contends that she is unable to work due to multiple musculoskeletal,

psychological, and gastrointestinal issues.

1.      **Musculoskeletal Health**

Pickhover has a history of carpal tunnel syndrome, fibromyalgia, lumbar degenerative

disc disease, chronic pain syndrome, osteoarthritis, and chronic lumbar radiculopathy.  (A.R. at

506).  Dr. Anna Somerto reported that an electromyography ("EMG") test showed "mild to

moderate" carpal tunnel syndrome on July 6, 2016.  (*Id.* at 781, 783).  Dr. Victoria Bruegel

conducted carpal tunnel release surgery on Pickhover's right hand on December 15, 2017, and on

her left hand on January 26, 2018.  (*Id.* at 1271, 1273).  Dr. Somerto's progress notes from May

2, 2018 indicate that  Pickhover's carpal tunnel symptoms had "greatly improved" after

undergoing surgery.  (*Id.* at 1672).

Dr. Sreekala Vasudevan, a rheumatologist, treated Pickhover for other musculoskeletal conditions beginning in 2017.  Dr. Vasudevan's first assessment, on April 27, 2017, noted that plaintiff showed signs of polyarthralgia, plantar fasciitis, and pain on the left hip, knees, and right shoulder.  (*Id.* at 989).  She also noted evidence of right rotator cuff syndrome, bilateral troch bursitis, and left knee osteoarthritis.  (*Id.*).  On June 5, 2017, she administered analgesic injections to the left knee and left trochanteric bursa and prescribed Gabapentin and Nabumetone.  (*Id.* at 983-84).  She administered analgesic injections to the right knee and right subacromial bursa on July 5, 2017.  (*Id.* at 979).

On January 5, 2018, Dr. Vasudevan noted abnormal findings of pain, tenderness, and swelling in Pickhover's knees.  (*Id.* at 1223).  Her treatment notes reported that Pickhover had "temporary improvement from previous cortisone injection."  (*Id.* at 1224).  Her examination on February 8, 2018, indicated pain and tenderness on the knees with swelling of the right knee, but her musculoskeletal examination was otherwise "normal."  (*Id.* at 1219).  She performed injections in both knees.  (*Id.*).  On April 30, 2018, she diagnosed fibromyalgia and noted pain and tenderness on both knees and 16/18 fibromyalgia trigger points.  (*Id.* at 1215).  She reported that previous cortisone injections were "temporarily helpful" and changed Pickhover's medication to Lyrica 75 mg.  (*Id*. at 1215-16).  On May 29, 2018, she reported 10/18 fibromyalgia trigger points and increased Lyrica to 150 mg.  (*Id.* at 1210-11).  On September 5, 2018, she did not note any abnormal findings and reported a normal musculoskeletal examination.  (*Id.* at 1883).

Dr. Vasudevan continued to treat Pickhover throughout 2019.  On January 8, 2019, she did not note any abnormal findings, only pain and tenderness on the cervical spine and

lumbosacral spine.  (*Id.* at 1879).  She noted a normal musculoskeletal examination, that

medication was "significantly helping" with pain management, and that wearing special footwear

helps with her plantar fasciitis.  (*Id*. at 1877-79).  On April 9, 2019, she did not note any

abnormal findings and reported four fibromyalgia trigger points.  (*Id.* at 1875).  In addition, she

reported medication was "working well for the fibromyalgia" and that Pickhover had "just

[come] back from [Universal Studios]."  (*Id.* at 1873).  On July 17, 2019, she noted 8/18

fibromyalgia trigger points in her assessment.  (*Id.* at 1871).  She also noted that Pickhover has

been frequenting the gym a "few days a week" and expressed wanting to return to work

"eventually."  (*Id.* at 1869).  She reported "few" fibromyalgia trigger points on November 10,

2019.  (*Id.* at 1867).  Dr. Vasudevan's treatment was in conjunction with pain management

services provided by Dr. Kyle Tokarz.  (*Id.* at 1729-36, 1778-79, 1825-26).

On December 16, 2019, Pickhover's condition appeared to have worsened.  (*Id.* at 1962).

Dr. Vasudevan reported that she was "in tears" with "a lot of pain" and noted 14/18 fibromyalgia

trigger points.  (*Id.* at 1962, 1964).  Dr. Vasudevan did not note a reason as to the change in

condition.

### 2.   **Mental Health**

In terms of her mental health, Pickhover has a history of depressive disorder, post-

traumatic stress disorder, and anxiety disorder.  (A.R. at 506).  Dr. Joshua Golden has treated

Pickhover for depression and anxiety since at least April 9, 2015.  (*Id.* at 892).  On April 22,

2016, he noted that her affect was "calm and stable" and indicated that she was "handling"

therapy well and tolerating her medications well.  (*Id.* at 906).  Throughout 2016, he reported

that her mental state examination ("MSE") was stable, that she was tolerating her medication,

and that her mood was good.  (*Id.* at 908, 910-12, 914-15, 919).  In addition, during her therapy

session on September 7, 2016, he noted that she was "going to the Caribbean soon on a cruise."

(*Id.* at 914).  He continued to report a stable MSE on March 10, 2017.  (*Id.* at 924).  On May 8, 2017, he noted that her mood seemed "fairly good."  (*Id.* at 939).  On October 25, 2017, he reported that she is "doing better with moods overall."  (*Id.* at 1476).

Dr. Golden continued to treat Pickhover through 2018.  (*Id.* at 1481-94, 2142-43).  She reported feeling "really frustrated" due to her physical and cognitive issues during her visit with Dr. Golden on January 26, 2018.  (*Id.* at 1482).  However, on March 28, 2018, he described her affect as "more stable."  (*Id.* at 1487).  On July 6, 2018, she expressed feeling "more hopeful" than she had been in "a long time."  (*Id.* at 1493).  On November 7, 2018, he noted that she was recuperating from a hysterectomy but that she desired to return to work.  (*Id.* at 2142).  On December 5, 2018, he continued to describe her mood as "fairly good" and reported that her relationship with her boyfriend was stable.  (*Id.* at 2143).

On January 2 and February 1, 2019, Dr. Golden continued to report that Pickhover's mood was "fairly good."  (*Id*. at 2145-46).  He reported that her "home life [was] fairly good" and that she was tolerating her medication well on March 20, 2019.  (*Id.* at 2150).  During a treatment visit in May 2019, he reported that she demonstrated logical thought process, reality-based thought content, perception within normal limits, and intact judgment.  (*Id.* at 2154).  On September 13 and October 2, 2019, he reported that her mood was "fair."  (*Id.* at 2163, 2165).  On December 18 and 27, 2019, he noted that she had high anxiety associated with her upcoming hearing but that she was improving medically.  (*Id.* at 2169, 2171).

### 3.   Gastrointestinal Health

Pickhover has a history of cyclical vomiting syndrome, diverticulosis of sigmoid colon, generalized abdominal pain, nausea, constipation, and gastroesophageal reflux disease without esophagitis.  (A.R. at 506, 732, 1160, 1852-53).  She first reported ongoing nausea and constipation on June 20, 2016.  (*Id.* at 777).  She was hospitalized from January 10 to 12, 2017,

for vomiting, nausea, and diarrhea.  (*Id.* at 737).  On January 13, 2017, she sought emergency

care due to severe vomiting with abdominal pain.  (*Id.* at 732).  The doctor opined that her

symptoms were due to "a component of both opiate withdrawal as well as component of possible

cyclical vomiting syndrome related to marijuana . . . ."  (*Id.*).

   Pickhover again sought emergency care for nausea, vomiting, and diarrhea in August,

October, and November 2017.  (*Id.* at 1044, 1060, 1066).  On December 5, 2017, she reported

having "issues with cyclic vomiting for as long as she can remember."  (*Id.* at 1160).  She

acknowledged that her symptoms "may have worsened since she started" using marijuana but

that she continued to have nausea even though she stopped the marijuana use a week prior.  (*Id.*

at 1160).

   From February to March 2018, Pickhover continued to report gastrointestinal issues to

various medical providers.  (*Id.* at 1129, 1487).  On April 3, 2018, Dr. Nithin Karanth, a

gastroenterologist, noted that an examination showed "unremarkable" results.  (*Id.* at 1143).  She

sought further treatment for nausea in April and June 2018.  (*Id.* at 1229, 1255).  An abdominal

computerized tomography ("CT") scan indicated colonic diverticulosis without diverticulitis.

(*Id.* at 1230).  The discharge diagnosis was cyclic vomiting syndrome.  (*Id.*).

   On January 24, 2019, Pickhover sought treatment with her primary-care provider, Dr.

Kevin Delahanty, for recurring nausea and diarrhea.  (*Id.* at 1720).  In February 2019, she

reported having nausea and diarrhea "every two weeks."  (*Id.* at 2146).  She sought emergency

treatment for intractable nausea and vomiting with diarrhea in March and May 2019.  (*Id.* at

1922, 1932).  She continued to report gastrointestinal issues to various providers through June

and July 2019.  (*Id.* at 1738, 1758).  On July 26, 2019, an abdominal CT scan indicated evidence

of colonic diverticulitis with diffuse thickening of the sigmoid colon and suggestion of a fistula

formation between the sigmoid colon and vagina.  (*Id.* at 1852).

On August 1, 2019, Dr. Victor Pricolo evaluated her for diverticulitis.  (*Id.* at 1764).  She underwent a barium enema, which indicated extensive diverticulosis involving the sigmoid colon and some narrowing of the sigmoid colon suggesting spasm or chronic diverticulitis.  (*Id.* at 1853).  On August 29, 2019, gastroenterologist Dr. Kevin Murphy noted that she had a "extensive sigmoid diverticulosis" and had symptoms of nausea, vomiting, and epigastric pain. (*Id.* at 1785, 1787).  On September 12, 2019, she sought emergency care for increased abdominal pain and diarrhea; an abdominal CT scan indicated scattered colonic diverticulosis without acute diverticulitis.  (*Id.* at 1908, 1916).  On September 18, 2019, Dr. Murphy opined that, "at her young age and with her extensive diverticular disease and chronic daily nausea related to her constipation, she should have part of her colon removed surgically."  (*Id.* at 1792).  On October 8, 2019, Dr. Pricolo completed a laparoscopic lysis of adhesions and resection of the sigmoid colon with coloproctostomy.  (*Id.* at 1817).

###    C.    Residual Functional Capacity Assessments and Related Opinions

On April 24, 2017, examiners from the state's Disability Determination Services ("DDS") completed a residual functional capacity ("RFC") form for Pickhover.  (A.R. at 114). DDS based its 17-page evaluation on a review of her statements and medical records until April 6, 2017.  (*Id.* at 99-102).  The record evidence does not contain any medical opinions.  (*Id.*). DDS did not require a consultative examination.  (*Id.* at 103).  The evaluation contains one-word answers and short phrases and sentences.  (*Id*. at 98-114).  DDS determined that she suffers from the following severe medically determinable impairments:  disorders of the muscle, ligaments, and fascia; carpal tunnel syndrome; depressive, bipolar, and related disorders; anxiety and obsessive-compulsive disorders; and substance addiction disorders.  (*Id.* at 105).  DDS reported that her nausea and vomiting is a "component of both opiate withdrawal" as well as "possible

cyclical vomiting syndrome related to marijuana." (*Id.* at 104).  It determined that she "retains the capacity to perform basic tasks and relate with others well enough for routine workplace purposes." (*Id.* at 106).  Based on her RFC, it concluded that she is not disabled but should be limited to "sedentary" work. (*Id.* at 113).

On January 9, 2018, at the request of DDS, Dr. Marnee Colburn, an examining psychologist, completed a five-page consultative examination report. (*Id.* at 1116).  She based her report on medical records, an MSE, and a clinical interview with Pickhover. (*Id.*).  Dr. Colburn reported that Pickhover "had very poor eye contact throughout the evaluation and cried frequently." (*Id.* at 1116-17).  She noted that Pickhover said she had a "decent" relationship with her sister and a "good relationship" with her adult daughter. (*Id.* at 1117).  She also noted that Pickhover has had a boyfriend for at least five years and has been living with family friends since January 6, 2016. (*Id.*).

Pickhover stated that her weekly therapy sessions were "helpful for her." (*Id.* at 1118).  In her conversations with Dr. Colburn, she stated that she does not like "crowds" and does not like "being around people." (*Id.* at 1118-19).  She does, however, have "old friends who stop by [her home]." (*Id.* at 1119).  Dr. Colburn reported that Pickhover's responses in her MSE suggest that she is "of average intelligence and has mild deficits in memory and concentration." (*Id.*).  Dr. Colburn concluded that Pickhover appears depressed but that she would be capable of understanding and remembering basic tasks and concentrating on simple repetitive tasks. (*Id.* at 1120).  In addition, she noted that Pickhover, socially, "would most likely have difficulty interacting even on a superficial basis in most work settings." (*Id.*).

DDS completed a second RFC on January 17, 2018. (*Id.* at 153).  DDS based its 21-page evaluation on review of Pickhover's statements and medical records through January 16, 2018.

(*Id.* at 136-42).  DDS also considered Dr. Colburn's consultative examination.  (*Id.* at 136, 143).

The DDS evaluation contained one-word answers and short phrases and sentences.  (*Id.* at 134-

53).  DDS again determined that she suffers from the following severe medically determinable

impairments:  disorders of the muscle, ligaments, and fascia; carpal tunnel syndrome; depressive,

bipolar, and related disorders; anxiety and obsessive-compulsive disorders.  (*Id.* at 144).  In

addition, DDS determined that she suffers from the following non-severe impartments:

substance addiction disorders; attention deficit and hyperactivity disorder; and trauma and

stressor-related disorders.  (*Id.* at 145).  DDS determined that she "is able to tolerate minimum

social demands of a simple-task setting."  (*Id.* at 151).  And noted that she "should never climb

or crawl" due to pain and "poor functioning" and is limited to "only occasionally grasping and

twisting" due to carpal tunnel syndrome.  (*Id.* at 148).  The evaluation did not consider nausea or

cyclic vomiting syndrome as an impairment.  (*Id.* at 144-45).  In addition, the evaluation did not

consider any medical opinions related to her gastrointestinal condition.  (*Id.* at 136-42).  Based

on her RFC, DDS concluded that she is not disabled but should be limited to "sedentary" work.

(*Id.* at 152-53).

Dr. Sreekala Vasudevan, Pickhover's treating rheumatologist, completed an RFC form on

December 16, 2019.  (*Id.* at 1894).  The RFC form is a six-page questionnaire that instructs the

treating doctor to "be specific with regards to your patient's medical ailments and how they

affect his or her daily activities both at work and at home."  (*Id.* at 1889).  She provided minimal

responses to the questionnaire.  (*Id.* at 1889-93).  She noted that Pickhover's prognosis is "fair."

(*Id.* at 1890).  She indicated that Pickhover could stand for 15-30 minutes and sit for 30 minutes

due to pain.  (*Id.*).  She reported that Pickhover is in "constant pain" of a level of "8/10."  (*Id.* at

1892).  She also rated Pickhover's credibility as to claims of pain a "10/10."  (*Id.* at 1893).

When asked if there was an objective medical reason for the pain, she wrote "yes." (*Id.*). However, she did not include any evidence or further explanation for her assessment. (*Id.*).

On January 8, 2020, Eve Vaughn, a vocational expert, testified at a hearing before an administrative law judge ("ALJ") concerning the kind of work Pickhover could perform with her limitations. (*Id.* at 68). She testified that a hypothetical person with Pickhover's RFC could not perform her past work but would be able to find other employment in the economy. (*Id.* at 89). However, she also testified that an individual who misses two unexcused days of work (or more) per month due to anxiety or pain would not be able to maintain employment. (*Id.* at 90). She testified that "an employer will not tolerate if an employee [takes] frequent breaks of more than five minutes, more than once an hour . . . ." (*Id.* at 92). She stated that "[m]ost jobs have a probatory period" that generally lasts 30 to 60 days. (*Id.* at 93). And that during that probatory period, an employee is expected to be on task for the "majority of the day" and "only take their breaks and lunch at scheduled times" to be employable. (*Id.*). As to tardiness and early dismissals, she testified that being more than five minutes late or having to leave work more than 15 minutes early on more than one occasion per month would preclude employment. (*Id.* at 94).

### D.   **Procedural Background**

Pickhover applied for disability benefits and supplemental security income on January 19, 2017, contending that she was disabled because of issues related to her musculoskeletal, mental, and gastrointestinal health. Her application was initially denied on April 24, 2017, and was presented for reconsideration on January 17, 2018. She appeared for a hearing before an ALJ on August 29, 2018. The ALJ issued a decision denying her application on October 24, 2018.

Pickhover filed a request for review of the ALJ's decision with the Appeals Council, which was granted. The Appeals Council remanded the case to the ALJ on July 16, 2019. On

10

remand, she appeared and testified at a hearing before an ALJ on January 8, 2020.  The ALJ

denied her application on March 3, 2020.  On September 20, 2020, the Appeals Council denied

her request for further review.  This appeal followed.

## II.     Analysis

### A.     Standard of Review

Under the Social Security Act, this Court may affirm, modify, or reverse the final

decision of the Commissioner, with or without remanding the case for a rehearing.  42 U.S.C.

§ 405(g).  The ALJ's factual findings, "if supported by substantial evidence, shall be

conclusive," *id.*, because "the responsibility for weighing conflicting evidence, where reasonable

minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ."

*Seavey v. Barnhart*, 276 F.3d 1, 10 (1st Cir. 2001) (citation omitted); *see Evangelista v. Sec'y of

Health & Hum. Servs.*, 826 F.2d 136, 143-44 (1st Cir. 1987).  The ALJ's factual findings are

supported by substantial evidence "if a reasonable mind, reviewing the evidence in the record as

a whole, could accept it as adequate to support his conclusion."  *Rodriguez v. Sec'y of Health &

Hum. Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).  "Judicial review of a Social Security Claim is

limited to determining whether the ALJ used the proper legal standards and found facts upon the

proper quantum of evidence."  *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).

However, the Court may reverse or remand the ALJ's decision when the ALJ ignored

evidence or made legal or factual errors.  *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999)

("The ALJ's findings . . . are not conclusive when derived by ignoring evidence, misapplying the

law, or judging matters entrusted to experts."); *Moore v. Astrue*, 2013 WL 812486, at *2 (D.

Mass. Mar. 2, 2013) (citation omitted) ("[I]f the ALJ made a legal or factual error, the Court may

reverse or remand such decision . . . .").  Accordingly, if the "ALJ failed to record consideration

of an important piece of evidence that supports [the claimant's] claim and, thereby, left

unresolved conflicts in the evidence, [the] Court cannot conclude that there is substantial evidence in the record to support the Commissioner's decision." *Nguyen v. Callahan*, 997 F. Supp. 179, 183 (D. Mass. 1998); *see also Crosby v. Heckler*, 638 F. Supp. 383, 385-86 (D. Mass. 1985) ("Failure to provide an adequate basis for the reviewing court to determine whether the administrative decision is based on substantial evidence requires a remand to the ALJ for further explanation.").  Questions of law are reviewed *de novo*.  *Seavey*, 276 F.3d at 9.

      **B.**    **Standard for Entitlement to SSDI Benefits**

An individual is not entitled to social security disability insurance ("SSDI") benefits or SSI benefits unless he or she is "disabled" within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423(d) (setting forth the definition of disabled in the context of SSDI); 42 U.S.C. §§ 1382c(a)(1), 1382c(a)(3)(A) (same in the context of SSI).  "Disability" is defined, in relevant part, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than" 12 months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The impairment must be severe enough to prevent a claimant from performing not only past work, but also any substantial gainful work existing in the national economy.  *See* 20 C.F.R. § 404.1560(c)(1).

The Commissioner uses a sequential five-step process analysis to evaluate whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520.  The steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had . . . a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the 'listed impairments' in the Social Security regulations, then the application is granted; 4) if the applicant's 'residual functional capacity' is such that he . . . can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 404.1520(a)(4).  "The applicant has the burden of production and proof at the first four steps of the process," and the burden shifts to the Commissioner at step five to "com[e] forward with evidence of specific jobs in the national economy that the applicant can still perform."  *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001) (citation omitted).  At that juncture, the ALJ assesses the claimant's RFC in combination with the "vocational factors of [the claimant's] age, education, and work experience," 20 C.F.R. § 404.1560(c)(1), to determine whether the claimant can "engage in any . . . kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

### C.   The Administrative Law Judge's Findings

In evaluating the evidence, the ALJ followed the five-step procedure set forth in 20 C.F.R. § 404.1520(a)(4).

At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity during the period since her alleged disability onset date of March 19, 2016.  (A.R. at 13).

At step two, the ALJ considered the medical severity of her impairments and determined that plaintiff has severe anxiety disorder, depressive disorder, posttraumatic stress disorder, carpal tunnel syndrome, left knee osteoarthritis, fibromyalgia, cyclical vomiting syndrome, and degenerative disc disease of the lumbar spine that resulted in significant limitations to her ability to perform basic work activities.  (*Id.*).

At step three, the ALJ found that Pickhover does not have any impairment or combination of impairments that meet the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.  (*Id.*).  First, he stated that plaintiff's spinal impairments do not satisfy the criteria outlined in Section 1.04 of the Listings of Impairments.  (*Id.*).  He determined that she did not meet the criteria under Section 1.04A of the Listings because she did not present

clinically with motor loss and reflex loss.  (*Id.*).  He determined that she did not meet the criteria

under Section 1.04B because she did not have any confirmed diagnosis of spinal arachnoiditis.

(*Id.*).  And he determined that she did not meet the criteria under 1.04C of the Listings because

she did not lack the ability to ambulate effectively.  (*Id.*).

Second, he considered plaintiff's knee impairments under Section 1.02 (major

dysfunction of a joint).  (*Id.*).  He determined that plaintiff did not meet or equal the criteria

under 1.02 because she did not lack the ability to ambulate effectively.  (*Id.*).

Third, he considered the severity of plaintiff's mental impairments.  He found that her

mental impairments, individually or in combination, did not meet the criteria of listings 12.04,

12.06, and 12.15.  (*Id.*).  In making that determination, the ALJ considered whether her mental

impairments met the paragraph B criteria, which requires that the mental impairment result in

one extreme limitation, or two marked limitations in a broad area of functioning.  (*Id.*).  Based on

the medical record, he concluded that the paragraph B criteria were not met because she had

moderate limitations in understanding, remembering, or applying information; a moderate

limitation in interacting with others; a moderate limitation regarding concentrating, persisting, or

maintaining pace; and mild limitations in adapting or managing herself.  (*Id.* at 13-14).  He found

that plaintiff's moderate and mild mental limitations did not meet the "two marked limitations"

or "one extreme limitation" criteria because they did not "seriously [limit] her ability to function

independently, appropriately, or effectively, and on a sustained basis."  (*Id.* at 14).

Lastly, the ALJ determined that plaintiff's mental impairments did not satisfy the

paragraph C criteria.  (*Id.* at 14).  He concluded that the record did not show that plaintiff's

mental impairments have led to ongoing treatment in a highly structured setting, nor did it show

that plaintiff had a minimal capacity to adapt to changes in her environment or new daily

demands.  (*Id.*).

At step four, the ALJ concluded that plaintiff has the residual functional capacity to perform sedentary work with occasional posture limitations, but that she is unable to perform any past relevant work.  (*Id.* at 15).  Specifically, he determined that she can occasionally push and pull with her left upper and lower extremity and has the occasional ability to grasp and twist with her left upper extremity.  (*Id.*).  He determined that she requires a position that allows her to sit for 15 minutes and stand for 10 minutes before returning to the seated position.  In addition, he concluded that she should be restricted to occasional interaction with the public, coworkers, and supervisors.  (*Id.*).  Overall, she would be limited to perform simple, routine, and repetitive tasks and requires a position with only occasional decision making and limited changes to her work environment.  (*Id.*).

In considering plaintiff's symptoms to make the step-four finding, the ALJ followed a two-step process.  (*Id.*).  He first considered whether there were any underlying impairments that could be shown by medically acceptable clinical or laboratory diagnostic techniques that could reasonably be expected to produce her symptoms.  (*Id.*).  Second, he evaluated the intensity, persistence, and limiting effects of those symptoms to determine the extent to which they limited her functional limitations.  (*Id.*).  For that purpose, whenever statements about the intensity, persistence, and limiting effect were not substantiated by objective medical evidence, he considered other evidence in the record to determine if the symptoms limited the ability to perform work-related activities.  (*Id.*).

After considering the record evidence, the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms.  (*Id.* at 16).  However, he found that her statements about the intensity, persistence, and limiting effects

15

of her symptoms were "not entirely consistent with the [objective] medical evidence and other evidence in the record."  (*Id.*).

As to the second step, the ALJ considered plaintiff's medical examinations, psychiatric treatment notes, records of prescribed medications, relationships with family and boyfriend, and opinions from treating and non-treating physicians.  (*Id.* at 16-20).  He also considered the opinions of DDS medical consultants and the treating source opinions of Dr. Colburn and Dr. Vasudevan.  (*Id.* at 20-21).  He assigned significant weight to Dr. Colburn's opinion that she would be limited to basic, simple, and repetitive tasks because that opinion is "consistent with and supported by the majority of the evidence pertaining to [her] psychiatric conditions."  (*Id.* 21).  However, he afforded "little weight" to Dr. Colburn's opinion that she "would have difficulty interacting even on a superficial basis" with others at work because he found "no support" for that conclusion.  (*Id.*).  He noted that plaintiff had gone on several vacations, has a good relationship with her boyfriend and family members, and has regularly presented with a happy mood and affect during treatment visits.  (*Id.*).  He noted that the evidence showed that her symptoms and functional abilities had improved overall since his October 2018 decision.  (*Id.* at 16).

As to the opinion of Dr. Vasudevan, the ALJ assigned "some weight" to her conclusion that plaintiff could only stand for 15-30 minutes, sit for 30-minute periods, and could rarely lift or reach with her upper extremities.  (*Id.* at 21).  He explained that he partially discounted Dr. Vasudevan's assessment because it was "not supported by additional explanation and [was] not fully consistent with the objective evidence."  (*Id.*).

Because the ALJ concluded that plaintiff would be unable to perform any past relevant work, he continued to step five of the analysis.  (*Id.* at 21).

16

At step five, the ALJ considered plaintiff's age, education, work experience, RFC, and the Medical-Vocational Guidelines to determine whether plaintiff could perform any other work. (*Id.* at 22).  Because her ability to perform the full range of sedentary work is limited, the ALJ consulted a vocational expert.  (*Id.*).  The vocational expert testified that an individual with her characteristics would be able to perform the following jobs:  document preparer, printed circuit board screener, and lenses inserter.  (*Id.* at 22-23).  Based on the testimony of the vocational expert, the ALJ concluded that plaintiff could successfully adjust to other work that exists in significant numbers in the national economy and was therefore not disabled within the meaning of the Social Security Act.  (*Id.* at 23).

### D.     Plaintiff's Objections

Plaintiff contends that the ALJ erred because (1) he did not properly weigh the medical source opinions of her treating physicians and (2) his assessment of her residual functional capacity finding did not sufficiently account for her cyclical vomiting syndrome, diverticulitis, and colon adenoma.

### 1.     Medical Source Opinions

Plaintiff first contends that the ALJ should have given controlling weight to the opinions of her treating physicians, Dr. Sreekala Vasudevan and Dr. Marnee Colburn.

The opinions of a treating source should be given controlling weight if "a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record . . . ."  20 C.F.R. § 404.1527(c)(2); *see also Conte v. McMahon,* 472 F. Supp. 2d 39, 48 (D. Mass. 2007). Nevertheless, "the law in this circuit does not require ALJs to give greater weight to the opinions of treating physicians" and they have discretion to resolve any evidentiary conflicts or

inconsistencies.  *Hughes v. Colvin,* 2014 WL 1334170, at *8 (D. Mass. Mar. 28, 2014) (quoting *Arroyo v. Sec'y of Health & Human Servs.,* 932 F.2d 82, 89 (1st Cir.1991)).

When an ALJ does not give a treating source's opinion controlling weight, he or she must determine the amount of weight to give the opinion based on factors such as (1) the length of the treatment relationship, (2) whether the treating source provided evidence in support of the opinion, (3) whether the opinion is consistent with the record as a whole, and (4) whether the treating source is a specialist.  20 C.F.R. § 404.1527(c).  The ALJ must "give good reasons in [his] notice of determination or decision for the weight [he gives the] treating source's opinion," and should not discount that opinion entirely.  20 C.F.R. § 404.1527(c)(2).  The ALJ must specifically articulate the reasons.  *See Linehan v. Berryhill*, 320 F. Supp. 3d 304, 306 (D. Mass. 2018) ("Where, as here, the Court cannot ascertain a clear understanding of why the ALJ rejected [the treating doctor's] opinion, the goal of the treating source rule is not met.") (internal quotations omitted); *Kem v. Berryhill*, 352 F. Supp. 3d 101, 112 (D. Mass. 2018);  *SSR* 96-2p, 1996 WL 374188, at *5 ("[T]he decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and *must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight*.") (emphasis added); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) ("The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error.");  *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) (noting that the court will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating [physician's] opinion and [it] will continue remanding when [it] encounter[s] opinions from [ALJs] that do not comprehensively set forth reasons for the weight assigned to a

treating physician's opinion.").  However, opinions that a claimant is "disabled or unable to work" are legal conclusions "reserved to the Commissioner because they are administrative findings that are dispositive of a case."  20 C.F.R. § 404.1527(d).

### a.    Dr. Sreekala Vasudevan

The ALJ provided an appropriate reason for not giving controlling weight to Dr. Vasudevan's residual functional capacity assessment.  He explained that the limitations in Dr. Vasudevan's assessment "are not supported by additional explanation and are not fully consistent with the objective evidence" in the record.  (A.R. at 21).

The RFC that Dr. Vasudevan completed is a six-page questionnaire that instructs the treating doctor to "be specific" with regards to her patient's medical ailments and limitations.  (*Id.* at 1889).  However, her answers in the questionnaire contain no explanatory details, narrative, or findings that may support her limiting assessment.  She provided minimal responses to the questionnaire, consisting of checking one of the options provided on the form or a few words not in complete sentences.  (*Id.* at 1889-1893).  She wrote that plaintiff cannot return or resume work "due to pain" and wrote "yes" when asked if there is an objective medical reason for the pain.  (*Id.* at 1893).  She failed to note any evidence that supports her conclusion.  (*Id.*).

Accordingly, the ALJ did not err in discounting Dr. Vasudevan's RFC questionnaire due to a lack of explanation.  And the inclusion of her treatment notes in the record do not change the Court's conclusion.  *See Martin*, 2016 WL 5376316, at *10 (D. Mass. Aug. 3, 2016) (holding that the treating doctor's suggestion that "reviewers 'see medical records' to determine which 'multiple medical conditions' [plaintiff] suffers is not sufficient support for the severe limitations" in his report).

**b.**    **Dr. Marnee Colburn**

The ALJ also provided appropriate reasons for discounting Dr. Colburn's opinion.  The ALJ assigned "little weight" to Dr. Colburn's conclusion that plaintiff "would have difficulty interacting even on a superficial basis."  (A.R. at 21).

First, he explained that he could not find support in the record for the conclusion that plaintiff would be incapable of even superficial interactions with others at work because the record shows that the "claimant has gone on several vacations, has a good relationship with her boyfriend and members of her family . . . ."  (*Id.*).  Second, he found that Dr. Colburn's opinion was inconsistent with the psychiatric record.  He stated that plaintiff had "regularly presented with a happy mood and affect during treatment visits" and noted that Dr. Golden repeatedly remarked on plaintiff's positive response to treatment, good affect, and normal eye contact.  (*Id.* at 16, 20-21).  Thus, the ALJ provided sufficient support for discounting Dr. Colburn's opinion based on inconsistencies within the record.

Accordingly, the ALJ adequately explained his decision to discount Dr. Vasudevan's and Dr. Colburn's assessments, and the decision will not be reversed on that ground.

**2.**    **Residual Functional Capacity Finding**

Plaintiff next contends that the ALJ's assessment of her residual functional capacity is not supported by substantial evidence because it does not sufficiently account for her cyclical vomiting syndrome, diverticulitis, and colon adenoma.

An ALJ's determination of a claimant's residual functional capacity must be supported by substantial evidence.  *Seavey*, 276 F.3d at 10.  Substantial evidence means that there is "more than a mere scintilla" of evidence, such that a reasonable mind could accept the evidence as "adequate to support" the ALJ's conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

"Since bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess claimant's residual functional capacity based on the bare medical record." *Berrios Lopez v. Sec'y of Health & Human Servs.*, 951 F.2d 427, 430 (1st Cir.1991). An ALJ's RFC must be supported by a "medical opinion" to be supported by substantial evidence. *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (holding that "[a]s a lay person, however, the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the determination."); *see also Beyene v. Astrue*, 739 F. Supp. 2d 77, 83 (D. Mass. 2010) (An ALJ's "determination of a claimant's RFC made without any assessment of a claimant's RFC by an expert is unsupported by substantial evidence . . . ."). A medical opinion is a statement from a medical source about what an individual can do despite one's impairments. 20 C.F.R. § 404.1513(a)(2).

Typically, the written opinion of a non-examining, non-testifying doctor who simply reviews the written medical evidence cannot alone constitute substantial evidence for an ALJ's conclusion. *Browne v. Richardson* 468 F.2d 1003, 1006 (1st Cir. 1972). That is because such an opinion "lacks the assurance of reliability" that comes from first-hand observation. *Id.* The evidentiary weight assigned to the opinion of a non-examining physician "will vary with the circumstances, including the nature of the illness and the information provided [by] the expert." *Berrios Lopez*, 951 at 431 (quoting *Rodriguez v. Sec'y of Health & Hum. Servs.*, 647 F.2d 218, 223 (1st Cir. 1981)). The report of an advisory physician may be considered substantial evidence if the physician had access to most of the medical evidence for their review and if the reports of multiple physicians "tend somewhat to reinforce each other's conclusions." *Berrios Lopez*, 951 F.2d at 431. The ALJ's conclusion may be based upon the reports of a non-

examining, non-testifying physician when "the record contains considerable evidence that would allow a reasonable person to" reach the same conclusion. *Rodriguez*, 647 F.2d at 223.

Here, the ALJ's determination of plaintiff's RFC is not supported by substantial evidence because it is not supported by an appropriate medical opinion. Specifically, his RFC determination was made without any assessment by a treating physician who evaluated and commented on the limitations posed by the plaintiff's gastrointestinal condition. The ALJ addressed the RFC assessments completed by Dr. Vasudevan and Dr. Colburn, which discuss how plaintiff's musculoskeletal and psychiatric conditions may limit her work performance. (*Id.* at 20-21). However, the ALJ's RFC was not supported by any assessments from treating doctors that addressed how plaintiff's documented history of cyclic vomiting, nausea, diarrhea, and other gastrointestinal illnesses could limit her in the workplace. And the record shows that several doctors treated plaintiff for her gastrointestinal illnesses. Absent an RFC finding from a medical doctor that assessed plaintiff's gastrointestinal conditions, the ALJ cannot make conclusions as to her gastrointestinal limitations. That is because, as a lay person, the ALJ is not qualified to interpret raw medical data.

Furthermore, the DDS evaluation conducted by state medical consultants did not provide a sufficient medical opinion to support the ALJ's RFC determination. The DDS consultants are non-treating, non-testifying physicians who based their assessments on a review of plaintiff's medical evidence. In *Berrios Lopez*, the court held that the ALJ could base his finding on the written opinion of two non-treating doctors because of the extent, detail, and quality of the medical evidence in those reports. *Id.* at 431. But unlike the reports in *Berrios Lopez*, the DDS assessment here is not as comprehensive. In fact, vomiting is only mentioned once in the initial DDS report and is absent from the second report. (*Id.* at 104, 164-65). Moreover, the DDS

evaluation is filled with "brief conclusory statements" and a "mere checking of boxes," the types of evaluations the court in *Berrios Lopez* noted should be given little evidentiary weight. *Berrios Lopez*, 951 F.2d at 431. Equally significant, the court in *Berrios Lopez* also noted the importance that reports from non-treating doctors be based on up-to-date information. *Id.* Here, DDS issued its latest report on January 17, 2018, more than a year before plaintiff's diagnosis of diverticulosis. (*Id.* at 153, 1787). Since the report's issue date, the record shows that plaintiff has been hospitalized and even undergone surgeries due to her gastrointestinal conditions. (*Id.* at 1817-18).

In addition, the DDS assessments here do not warrant the same evidentiary weight the court assigned them in *Reeves v. Barnhart*, 263 F. Supp. 2d 154 (D. Mass. 2003). There, the court held that the ALJ did not err by adopting the opinion of a DDS non-treating physician, over the opinions of many treating physicians, in assessing plaintiff's residual functional capacity. *Reeves*, 263 F. Supp. 2d at 161. The court in *Reeves* explained that the DDS report was supported by objective medical evidence and was not inconsistent with other medical evidence in the record. *Id.* Here, however, the DDS report is incomplete; the report lacks much of plaintiff's relevant medical data as to her gastrointestinal issues and conflicts with the medical record that shows that plaintiff's condition had worsened. In addition, unlike the DDS report in *Reeves*, the DDS report here does not contain any medical opinions from a treating physician that directly address how plaintiff's gastrointestinal condition could impact her ability to work. (*Id.* at 136-42).

Accordingly, the Court cannot conclude that the ALJ's assessment of plaintiff's residual functional capacity properly took into account her cyclical vomiting syndrome, diverticulitis, and colon adenoma. Remand is therefore appropriate as to that issue.

III.   **Conclusion**

For the foregoing reasons, plaintiff's motion for an order to reverse and remand the final

decision of the Commissioner of the Social Security Administration is GRANTED, and the

Commissioner's motion to affirm the action is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated: March 24, 2022                        Chief Judge, United States District Court